UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE SEARCH OF ) | |
| THE SUBJECT PHONE (SUPPRESSED) ) | 25 M 665 |
| ) | |
| ) | U.S. Magistrate Judge Gabriel A. Fuentes |
| ) | |

**MEMORANDUM OPINION AND ORDER**

Before the magistrate judge is the government's sealed Application and Affidavit for Search Warrant ("the Application"; D.E. 1), seeking authority under Federal Rule of Criminal Procedure 41 to search a mobile telephone ("the Subject Phone") for evidence of a suspected violation of 18 U.S.C. § 111(a)(1), namely the act of forcibly assaulting, resisting, impeding, or interfering with a federal officer in performance of the officer's duties during immigration enforcement activities undertaken in recent days in the Chicagoland area. The magistrate judge's jurisdiction to act on the Application arises from Congress's grant to magistrate judges of "all powers and duties conferred or imposed upon United States commissioners by law or by the Rules of Criminal Procedure for the United States District Courts." 28 U.S.C. § 636(a)(1). The specific details of the investigation, and the event being investigated, remain under seal at this time and cannot be discussed publicly. The proposed search warrant is not being approved or issued at this time, so it has not yet been executed. Instead, for the reasons explained below, the Court is denying the Application. This opinion explains why.

Some limited additional background information is necessary to a full understanding of the Court's ruling. The sealed Application[1] details an encounter between two U.S. Border Patrol

---

[1] The Court is granting the government's motion to seal the warrant application and related materials, and the names and specific details associated with the event have been excluded from the affidavit. However,

("USBP") officers and two individuals (referred to here as Individuals A and B) during broad daylight. The affidavit in support of the Application ("the Affidavit") states that Individuals A and B, approached the two USBP officers (referred to here USBP Agents 1 and 2) as they sat in a vehicle parked outside a building ("the Building"), and a physical altercation ensued. The Affidavit asserts that Individual B appears to have recorded the event with the Subject Phone by holding it in the direction of the encounter. Law enforcement agents seized the Subject Phone.[2] The Federal Bureau of Investigation investigated the encounter as a suspected violation of Section 111(a)(1), and FBI now has custody of the Subject Phone.[3] Separately, according to the Affidavit, a surveillance camera located at the Building captured video footage ("the Building Video") of the encounter. In the Affidavit, the FBI agent who signed the Affidavit ("the Affiant") describes the encounter as recorded by the Building Video. The Affidavit also includes numerous still images said to be taken from the Building Video and said to show various stages of the encounter.

The Court's review of the Affidavit raised several factual issues that the Court wanted to explore to have a better idea of what is known or knowable from the evidence relied on in the

---

some factual detail is included in this Memorandum Opinion and Order, to provide necessary context for understanding of the Court's ruling and reasoning. The Court considered carefully the factual matters to be excluded and included from the Memorandum Opinion and Order, against the backdrop of the Affidavit's confirmation that Individual B admitted an awareness of "the video" on the Subject Phone and is said to have been present for the events described in the Affidavit. Moreover, the Affidavit discloses that the FBI has already told Individual B that the government is seeking a search warrant to authorize a government search of the Subject Phone. Neither Individual A nor Individual B have been charged with a criminal offense, so their identities and most of the "who, what, when, and where" of the encounter should remain under seal, though the Court does not see a basis to seal every alleged factual issue to protect what is a very overt investigation as far as Individuals A and B are concerned. The Court also does not see a basis to seal the factual questions, as explained below, that give rise to the Court's refusal to grant the Application as presented without the Building Video.

[2] The precise circumstances and legality of the seizure of the Subject Phone are not clear from the Affidavit and are not before the magistrate judge at this time.

[3] The Affidavit states that the Subject Phone is being stored in a way that will prevent its contents from being erased remotely.

2

Affidavit. First, the Affidavit (at p. 6, fn. 7) indicates that "[c]ertain portions" of the Building Video "appear to skip over footage," and one such gap lasts about 58 seconds, so that the point in time during which Individuals A and B approach the USBP vehicle is not viewable, and thus the interval of time during which Individuals A and B were standing (as alleged) next to that vehicle is not known, at least by reference to the Building Video. If the Court could view the Building Video itself, it could judge for itself whether these gaps have an impact on the probable cause calculus, and if so, what that impact is. Commendably, the government disclosed that there are gaps including the 58-second gap mentioned above, but the Court again has been unable to assess those gaps for itself, without access to the Building Video.

Second, the Affidavit contains numerous still images that are grainy, fuzzy, or not clear enough, in the Court's view, to allow the Court to make any firm conclusions about the events the Affidavit says they depict, about the movements that Individual B is said to have made while holding the phone, or about the direction the USBP agents and Individuals A and B are said to be walking, if they are walking at all, during intervals in which the Affidavit offers interpretations of how the still photos indicate what these movements were. Without viewing the Building Video itself, the Court cannot draw reliable conclusions about these Affiant interpretations about the directions in which persons were moving, and thus the Court cannot evaluate a core part of the Affidavit's core narrative, which is that Individuals A and B initiated a confrontation in which the two USBP agents were victims and not instigators or aggressors.

Third, certain aspects of the Affidavit's account reflect internal inconsistencies, or inconsistencies between USBP accounts and the Affiant's recitation of what is shown on the Building Video. For example:

- The Affidavit contains a still image which the Affiant states shows Individuals A and B walking backward as one of the USBP agents walks toward them, and the Affidavit states

3

that the Building Video "appears to show that as one of the agents approached [Individual A] with pepper spray, Individual A swung at the agent," whereupon a physical altercation began between both USBP agents and Individual A. Affidavit ¶¶ 5, 10(f). Elsewhere in the Affidavit, the Affiant relates that the two USBP agents "directed Individuals A and B to back away from the vehicle," that Individuals A and B "refused to back away" (the Building Video does not contain audio, and neither USBP agent is said to have been equipped with a body-worn camera), and that the two USBP agents – and not just one – stepped out of their vehicle and approached Individuals A and B. Affidavit ¶ 5.

- The Affidavit reports that about three minutes and five seconds into the Building Video, a white-clad USBP agent, who is USBP Agent 1, is seen exiting the left side of the USBP vehicle and then "hurries" toward Individual A with the left hand extended, and that a still image in the Affidavit depicts Individual A walking backwards through the parking lot and away from USBP Agent 1. Affidavit ¶ 10(g). In footnote 10 of the Affidavit, the Affiant relates that USBP Agent 1 told the FBI that the agent saw Individual A punch USBP Agent 2 in the chest at least two times, whereupon USBP Agent 2 immediately responded by pepper-spraying Individual A, whereupon USBP Agent 1 exited the vehicle. Affidavit ¶ 10(g) n. 10. The Affidavit then reported that according to the Building Video, "it does not appear that [Individual A] punches USBP Agent 2 twice before the USBP Agent 1 exited the USBP vehicle, even as the Building Video "does depict, however, a physical altercation" between Individual A and USBP Agent 2 "later on." *Id.* In short, USBP Agent 1 is said in the Affidavit to have told the FBI that he saw Individual B strike USBP Agent 2 two times, but the FBI's Affiant stated that this assertion was not corroborated by the Building Video.

- The Affidavit offers the Affiant's apparent opinion, based on agent training and experience, that the Building Video "does not definitively show" whether Individual A "made contact" with USBP Agent 1, though the Affiant further "believe[s] that the footage shows that [Individual A] at the very least attempted to strike" USBP Agent 1. Affidavit ¶ 10(j). The Affiant further opines that although the video shows USBP Agent 1 approaching Individual A with the left hand extended, in a manner the Affiant says is "consistent with" USBP Agent 1 holding pepper spray, "the video footage does not conclusively establish" whether that agent actually "deployed" pepper spray (i.e., sprayed it at Individual A) before Individual A "swung his arms" toward USBP Agent 1. *Id.* The Affiant then adds that still images included in the Affidavit show Individual A, "immediately thereafter," stumbling backwards before turning away from USBP Agent 1, whereupon the USBP Agent 2 then chased Individual A. *Id.* Yet the Affidavit also says, in a passage contained in a footnote to that paragraph, that USBP Agent 1 told the FBI that after he exited the USBP vehicle, Individual A ran away, and that USBP Agent 1 chased Individual A and yelled at Individual A to stop running, then caught up to Individual A after about 10 yards and tried to detain Individual A, whereupon Individual A "resisted and fought back," punching USBP Agent 1 on the left side of the face, when USBP Agent 2 then ran to USBP Agent 1's aid. *Id.* n. 11.

- The Affidavit then describes an episode in which either Individual B made contact with the USBP vehicle, or in which that vehicle made contact with Individual B. The Affiant

4

    reported that a still image showed that Individual B was standing behind the vehicle as it "starts to reverse out" of the parking lot, Affidavit ¶ 10(o), although of course, the still image without the Building Video does not allow the Court to see that movement. More importantly, though, the Affidavit states that the rearward-moving vehicle then stops as Individual B walks closer to it and then "appears" to strike the back window of the vehicle with Individual B's left hand. *Id.* Yet elsewhere the Affidavit, the Affiant relates that the USBP Agent 1 told FBI that "as he was reversing" the USBP vehicle out of the parking spot, "the backup sensor alarmed and the USBP Agents noticed [Individual B] standing behind the vehicle, whereupon USBP Agent 2 exited the vehicle, while USBP Agent 1 agent put the vehicle in park and exited. Affidavit ¶ 11. At that point, according to the Affidavit, USBP Agent 1 observed Individual B on the ground, but this account indicated that USBP Agent 1 did not see how Individual B wound up on the ground. *Id.*

- Notably, the Affidavit represents that at roughly this point in the encounter, there was another gap in the Building Video footage, which "does not capture how [Individual A] ended up on the ground" specifically because of the gap in the footage. Affidavit ¶ 11 n. 13. The Building Video then is said to show USBP Agent 2 standing over Individual B and "dragging" – the Affidavit's word – Individual B "out of the path of the USBP vehicle." *Id.* Again, being denied the opportunity to review the Building Video, the Court is unable to assess whether there are material discrepancies in the agents' accounts or between their accounts and the Building Video, and the Court is unable to evaluate the impact on the probable cause determination. But the Court certainly would like to know more about just what happened to cause Individual B to go to the ground after the USBP vehicle's rear sensor sounded. At least, the Court would appreciate the ability to make an independent, detached, neutral judgment about what did or did not occur during this aspect of the encounter, or about what can or cannot be known about it.

    The above issues and questions go not only to whether the Subject Phone contains a video of the encounter in question, but also to whether probable cause exists to conclude that the crime of assault on a federal officer occurred, or that Individuals A or B, or any other person, committed that crime – and therefore whether a video contained on the Subject Phone could even be evidence of such an alleged crime. The above issues and questions implicate the Court's ability to understand facts concerning the encounter itself, and what happened during that encounter. They lessen the Court's ability to rely on the Affidavit's statements alone to determine probable cause. The inconsistencies between USBP Agent 1's account to the FBI and the Affiant's statements based on the Building Video also raise the question of whether it is possible that the USBP agents' accounts might be incorrect as to other matters that may not have been the focus of the FBI

5

Affiant's review. Making the Building Video available may or may not have addressed that important unknown, which at this point remains an unknown arising from the four corners of the Affidavit.

In making the probable cause determination necessary to trigger a duty to issue the warrant, *see* Fed. R. Crim. P. 41(d)(2), magistrate judges must perform their neutral and detached function and not serve merely as a rubber stamp for the authorities. *Leon v. United States*, 468 U.S. 897, 914 (1984). "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Illinois v. Gates*, 462 U.S. 213, 239 (1983). A magistrate judge's task on a search warrant application is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. Where the affidavit is the only evidence presented to the magistrate judge, the warrant stands or falls solely on the affidavit's contents. *United States v. Koerth*, 312 F.3d 862, 866 (7th Cir. 2002), citing *United States v. Roth*, 391 F.2d 507, 509 (7th Cir. 1967). But in carrying out their neutral and detached role, magistrate judges also may challenge the government to provide additional information before issuing a warrant. *United States v. Doan*, 245 Fed.Appx. 550, 555 (7th Cir. 2007) (per curiam), citing *Koerth*, 312 F.3d at 868. Magistrate judges often ask Assistant U.S. Attorneys, on presentation of a warrant application, to answer questions or to add facts to an affidavit. A magistrate judge may want to know more, for example, about the nature of an agent's training and experience cited as a basis for various opinions rooted in that training. A magistrate judge may ask the prosecutor to fill in factual gaps in an affidavit, or to supply more information about an affiant's basis for knowledge as to asserted facts. Asking for more information in support of a search warrant application is part of

6

the magistrate judge's job in rendering a neutral and detached evaluation of the application. *See Doan*, 245 Fed.Appx. at 555 ("rather than abrogating his neutral and detached role, the magistrate judge properly acted as an independent arbiter by . . . questioning the affidavit.") In practical terms, the Court's request to review the Building Video on the instant Application falls squarely within the magistrate judge's lane of exercising of due care as part of a proper probable cause determination.

The Court cannot conclude that the foregoing factual questions raised by the Affidavit are somehow irrelevant, incompetent or immaterial, as was once famously said. Or that discrepancies between the Affidavit and the Building Video are minor, negligible or unimportant. The Court cannot reach those sorts of conclusions, all of them very relevant to whether the Application establishes probable cause, based on the face of this particular Affidavit, which relies so heavily on a piece of video that the Court is not being permitted to see. Magistrate judges exercise their independent judgment to determine what evidence is enough to establish probable cause, and when to ask for more information. They are not rubber stamps. They do not make probable cause evaluations by merely ratifying the bare conclusions of others. Or so the U.S. Supreme Court has said.

Without having been shown the Building Video, the Court does not have enough information to grant the Application, and therefore the Application is DENIED. The government indicated orally that it may seek district court review of this order. If that occurs, the government may want to address, for the district court, any possible jurisdictional issues concerning such review.[4]

**SO ORDERED.**

                                              **ENTER:**

                                              **GABRIEL A. FUENTES**
                                              **United States Magistrate Judge**

**DATE: October 31, 2025**

---

[4] The state of the law allowing emergency district judge review of magistrate judge decisions rendered under their jurisdiction conferred by 28 U.S.C. § 636(a)(1) has been described as unclear. *See In re Establishment Inspection of Anthony Marano Co.*, 647 F. Supp. 3d 643, 654-56 (N.D. Ill. 2022) (collecting cases and stating that "Congress does not appear to have provided anywhere that any decision by a magistrate judge under Section 636(a)(1) is reviewable by a district court."); *United States v. Lopez*, 710 F Supp. 3d 849, 853-54 (D. Nev. 2024) (agreeing with *Anthony Marano* that "no provision of 28 U.S.C. § 636 authorizes this court to review the magistrate judge's probable-cause finding for Lopez's supervised-release violation," but reviewing the magistrate judge's decision nonetheless under what it called the district court's "plenary authority" over all aspects of a case). In *United States v. Info. Associated with Email Account*, 449 F. Supp. 2d 469, 473-75 (E.D. Pa. 2020), the district court reasoned that Congress expressly granted district court review jurisdiction over magistrate judges' bond determinations arising under their Section 636(a)(2) authority but was silent on whether review jurisdiction exists over their Section 636(a)(1) authority. Although lack of district court direct review jurisdiction over some magistrate judge decisions may seem counter-intuitive, courts may have limited authority, through "inherent power" arguments or local rules, to remedy gaps in congressionally conferred jurisdiction. *See United States v. Bryant,* 778 F. Supp. 3d 14, 19 (D.D.C. 2025) (refusing to find that automatic stays of release orders may be inferred from district court's authority to revoke such orders per 18 U.S.C. § 3145, given that Section 3145 does not provide for such automatic stays, and "the courts are not here to clean up Congress' drafting mistakes"). This Court does not reach this jurisdictional question and considers it to be one for the district court to resolve.